694 S.E.2d 508 (2010)
In The Matter of A.R.D.
No. COA10-153.
Court of Appeals of North Carolina.
June 15, 2010.
*509 Pamela Newell, Raleigh, for Guardian ad Litem.
Susan J. Hall, Fayetteville, for respondent-mother.
MARTIN, Chief Judge.
Respondent-mother appeals from the trial court's order terminating her parental rights to juvenile A.R.D. Respondent-mother contends the trial court abused its discretion by failing to appoint a guardian ad litem for her, and contends the trial court failed to conduct the termination hearing within ninety days of the filing of the petition to terminate her parental rights. We affirm.
The Alleghany County Department of Social Services ("DSS") became involved with this family when A.R.D.'s maternal grandfather ("grandfather") contacted DSS to report respondent-mother's erratic behavior. Respondent-mother had told the grandfather that she "was going to put A.R.D. in the trash, cut her up and put her in the garbage disposal and that she hated A.R.D." A social worker responded to the report with a home visit on 16 October 2006, and respondent-mother still appeared very depressed and resentful. On the same date, DSS filed a petition alleging that A.R.D. was neglected and lived in an environment injurious to her welfare. The district court entered an order for nonsecure custody, and placed A.R.D. with the grandfather.
On 7 November 2006, the district court entered an order adjudicating A.R.D. abused and neglected. The district court found that A.R.D. "shows no visible signs of neglect. *510 She is clean, appropriately dressed and well-nourished. However, what concerns the Court is the mother's temper, her emotional imbalance and her extreme resistance to an authority figure such as DSS." The district court ordered that A.R.D. remain in DSS custody and in the current placement with the grandfather, and that respondent-mother be evaluated by a psychiatrist or psychologist and comply with treatment recommendations. Respondent-mother agreed, in a consent order entered 17 January 2007, to comply with terms of her case plan.
After a review hearing on 10 April 2007, the district court ordered that A.R.D. be placed in respondent-mother's physical custody for a trial placement, and that respondent-mother continue to comply with mental health services and parenting classes. The next day, respondent-mother called DSS and stated that she could not care for A.R.D. because of her own conflicts with the grandfather. When respondent-mother learned that A.R.D. would be placed in foster care and a social worker came to remove A.R.D. from the home, respondent-mother screamed at the social worker, attempted to block the car from leaving the home, and had to be restrained by law enforcement. In an order entered 14 May 2007, the district court continued A.R.D. in foster care, but did not relieve DSS of reunification efforts.
In a court report prepared 19 June 2007, DSS noted that respondent-mother had completed anger management and parenting classes, obtained income, and completed one session of family counseling. DSS, however, noted that the conflict between respondent-mother and the grandfather prevented respondent-mother from adequately parenting A.R.D. On 20 November 2007, the district court entered a permanency planning order. The district court found that respondent-mother had served a written relinquishment of her parental rights on DSS, and ordered that the permanent plan for A.R.D. be changed to termination of parental rights.
On 13 May 2008, DSS filed a petition to terminate respondent-mother's parental rights. In the petition, DSS recounted respondent-mother's history of emotional outbursts and erratic behavior. DSS alleged that "[t]he combination of [respondent-mother's] depression, uncontrollable temper, and emotional imbalance has rendered [her] incapable of properly caring for her child and creates an atmosphere of potential danger for the Juvenile."
As grounds for termination, DSS alleged that A.R.D. was a neglected juvenile, that A.R.D. had lived outside the home for more than twelve months and respondent-mother had failed to make reasonable progress toward correcting the conditions that led to her removal, that respondent-mother had not provided any financial support for A.R.D. while A.R.D. had been placed outside the home, that A.R.D. was dependent and that respondent-mother was incapable of providing proper care, and that respondent-mother had willfully abandoned A.R.D. On 29 May 2008, the district court entered an order in which it concluded that respondent-mother was unable to identify A.R.D.'s father and ordered that the father be served by publication. The father has not been a party to these proceedings.
On 8 July 2008, respondent-mother filed an answer to the termination petition, in which she denied most of the allegations and counterclaimed for custody of A.R.D. DSS responded to the counterclaim on 21 July 2008. In a review order entered on 14 October 2008, the district court noted that reunification efforts ceased on or about 30 October 2007. The district court found that respondent-mother had completed anger management and parenting classes and obtained income, but DSS still considered her "emotionally unstable." The permanent plan for A.R.D. remained termination of respondent-mother's parental rights and adoption.
In a report dated 2 April 2009, the guardian ad litem for A.R.D. reported that respondent-mother had cut off contact with DSS and the guardian ad litem and refused to provide her address or phone number. The guardian ad litem reported that A.R.D. needed "emotional security," and that respondent-mother "has consistently showed [sic] signs of emotional instability and poor judgment." The case came on for adjudication hearings on 7 January 2009, 11 March 2009, and 12 *511 May 2009. Respondent-mother testified on her own behalf at the 12 May 2009 hearing.
On 26 June 2009, the trial court entered an adjudication order in which it concluded that grounds existed to terminate respondent-mother's parental rights based on neglect and the willful failure to make reasonable progress toward correcting the conditions that led to A.R.D.'s removal from the home. The trial court specifically found:
The combination of the mother's uncontrollable temper, emotional imbalance, dishonest behavior, uncooperative nature and actual specific acts of abuse and neglect as cited hereinabove have rendered the mother incapable of properly caring for her child, has created an atmosphere of potential danger for the Juvenile and establish by clear cogent and convincing evidence that her parental rights should be terminated[.]
After a disposition hearing on 12 August 2009, the trial court entered a 25 August 2009 disposition order in which it adopted the salient findings of fact from the adjudication order, made some additional findings, and concluded that it was in A.R.D.'s best interests to terminate respondent-mother's parental rights. Respondent-mother appeals.
We first address respondent-mother's argument that the trial court abused its discretion by failing to appoint her a guardian ad litem. We disagree.
Our General Statutes provide that a trial court may appoint a guardian ad litem for a parent in a termination of parental rights case "if the court determines that there is a reasonable basis to believe that the parent is incompetent or has diminished capacity and cannot adequately act in his or her own interest." N.C. Gen.Stat. § 7B-1101.1(c) (2009).
"A trial judge has a duty to properly inquire into the competency of a litigant in a civil trial or proceeding when circumstances are brought to the judge's attention, which raise a substantial question as to whether the litigant is non compos mentis." In re J.A.A. & S.A.A., 175 N.C.App. 66, 72, 623 S.E.2d 45, 49 (2005). Whether to conduct such an inquiry is in the sound discretion of the trial judge. Id. "It is well established that where matters are left to the discretion of the trial court, appellate review is limited to a determination of whether there was a clear abuse of discretion." White v. White, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985). This Court has also reviewed findings of diminished capacity for abuse of discretion. In re M.H.B., 192 N.C.App. 258, 266, 664 S.E.2d 583, 588 (2008). "A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." White, 312 N.C. at 777, 324 S.E.2d at 833.
Under N.C.G.S. § 35A-1101, an incompetent adult is defined as
an adult ... who lacks sufficient capacity to manage the adult's own affairs or to make or communicate important decisions concerning the adult's person, family, or property whether the lack of capacity is due to mental illness, mental retardation, epilepsy, cerebral palsy, autism, inebriety, senility, disease, injury, or similar cause or condition.
N.C. Gen.Stat. § 35A-1101 (2009). Likewise, "our Court has also defined diminished capacity in the juvenile context as a lack of ability to perform mentally." In re M.H.B., 192 N.C.App. at 262, 664 S.E.2d at 586 (internal quotation marks omitted). We conclude that the record does not evidence any circumstance which would call into question respondent-mother's mental competence, her ability to perform mentally, or to act in her own interest.
Respondent-mother testified at the disposition hearing that she was doing some work at the ambulance base and in home health care, and that she worked at a convenient store. At the adjudication hearing, she testified that she provided in home health care to two patients, one of whom had dementia, and that she had a clean work history with both patients. She testified that she was working toward her EMT license.
Respondent-mother likens her case to In re N.A.L. & A.E.L., Jr., 193 N.C.App. 114, 666 S.E.2d 768 (2008), where this Court *512 found error in failing to appoint a guardian ad litem for respondent-mother where "the allegations made by DSS and the diagnosis of respondent-mother" indicated "problems in controlling her anger outbursts; her significant tendency to be aggressive towards others;" her low IQ; a personality disorder; and Borderline Intellectual Functioning. Id. at 118-19, 666 S.E.2d at 771. The trial court, in the case sub judice, mentions respondent-mother's "emotional imbalance" and states that "[respondent-mother] admits that her psychiatric evaluation found her to `have a flare for dramatic behavior,' be easily excited, be prone to emotional outbursts, be overly sensitive to the opinions of others and be impulsive and rebellious." There was also anecdotal evidence of some erratic behavior by respondent-mother presented at the hearing. However, none of this evidence amounts to a diagnosis of a mental health issue or indicates that respondent-mother was unable to handle her own affairs. Therefore, we conclude that the trial court did not abuse its discretion in failing to inquire as to respondent-mother's competency, and overrule this assignment of error.
The dissent notes the trial court's various findings of fact about respondent-mother's erratic behavior, including that she was involuntarily committed after an incident where she had to be subdued by the police. The dissent believes that this behavior evidences a mental condition that resembles that of the parents in In re N.A.L. & A.E.L., Jr., 193 N.C.App. 114, 666 S.E.2d 768 (2008), and In re M.H.B., 192 N.C.App. 258, 664 S.E.2d 583 (2008). We believe that one critical distinguishing factor between In re N.A.L. and In re M.H.B. and the current case is the existence of a diagnosis of a mental illness. In In re M.H.B., the trial court notes that the father alleged he suffered from posttraumatic stress disorder and had been diagnosed as being manic depressive and bipolar. In re M.H.B, 192 N.C.App. at 262-63, 664 S.E.2d at 586. The trial court further found that the father had received mental health treatment and was back on his medication for his mental illness. Id. In addition, the trial court noted that the father did not know why he was at the adjudication hearing. Id. Likewise, in In re N.A.L., the mother was "diagnosed as having Personality Disorder NOS and Borderline Intellectual Functioning." In re N.A.L., 193 N.C.App. at 118, 666 S.E.2d at 771. Additionally, we note that although the dissent points out singular similarities between the three cases such as the fact that the father in In re M.H.B. threatened to commit suicide and the trial court in the case sub judice believed that respondent-mother may harm herself, when viewing the totality of the circumstances, the parents in In re N.A.L. and In re M.H.B. showed significant evidence of incapacity that respondent-mother does not. Id.; M.H.B., 192 N.C.App. at 263, 664 S.E.2d at 586. We reemphasize that respondent-mother in the case sub judice was able to testify on her own behalf at both the 12 May 2009 adjudication and the disposition hearing, and there was no evidence to suggest that respondent-mother was diagnosed with any mental health disorder. In fact, respondent-mother answered "No," when she was asked at the 12 May 2009 hearing, "[P]rior to this action being brought have you ever been diagnosed by a mental health professional as [having] any kind of mental health disorder?"
Although, as the dissent notes, the mother was ordered to undergo a psychological evaluation, the results of the evaluation do not appear in the record, and any use of those results in our review as evidence that she was incompetent would be purely speculative. The mere fact that the trial court ordered an evaluation is not dispositive in itself, especially because the consent order makes it clear that the evaluation and following of the recommendations were part of a plan so that respondent-mother could resume visitation. As respondent-mother had made threats to harm A.R.D. in the past, it would be prudent to require a psychological evaluation before visitation was resumed. In any event, as we have noted here, doubting respondent-mother's ability to parent A.R.D. does not necessarily indicate to the trial court that respondent-mother was incapable of handling her affairs.
Respondent-mother's remaining argument is that the trial court failed to enter the termination order within ninety days of the filing of the petition to terminate her *513 parental rights. "The hearing on the termination of parental rights shall be conducted... no later than 90 days from the filing of the petition or motion unless the judge pursuant to subsection (d) of this section orders that it be held at a later time." N.C. Gen. Stat. § 7B-1109(a) (2009). Section (d) provides that "[c]ontinuances that extend beyond 90 days after the initial petition shall be granted only in extraordinary circumstances when necessary for the proper administration of justice, and the court shall issue a written order stating the grounds for granting the continuance." N.C. Gen.Stat. § 7B-1109(d). Time limitations in the juvenile code are not jurisdictional, and the appellant bears the burden of proving any delay was prejudicial. See In re C.L.C., K.T.R, A.M.R. & E.A.R., 171 N.C.App. 438, 443, 615 S.E.2d 704, 707 (2005), aff'd per curiam, disc. review improvidently allowed, 360 N.C. 475, 628 S.E.2d 760 (2006).
In this case, DSS filed the petition to terminate respondent-mother's parental rights on 13 May 2008. The first adjudication hearing was not held until 7 January 2009, well beyond the ninety day statutory time period. Respondent-mother asserts that she was prejudiced because she was not allowed additional visitation with A.R.D. and because the trial court did not proceed on her motion to modify custody presented in her counterclaim. We conclude that additional visits with A.R.D. or a custody hearing would not have changed the ultimate outcome of the termination proceeding. Respondent-mother presented no evidence that she had rectified the situation which led to A.R.D.'s removal in the ninety days between 13 May 2008 and 13 August 2008, or between 13 August 2008 and the hearing on 7 January 2009. Thus, the trial court possessed the requisite grounds to terminate parental rights on all three dates and respondent-mother was not prejudiced by the delay in the proceeding. See In re J.Z.M., R.O.M., R.D.M. & D.T.F., 184 N.C.App. 474, 480, 646 S.E.2d 631, 635 (2007) (Steelman, J. dissenting) (stating that there was a lack of prejudice because "[n]o assertion [was] made that had [respondent-mother] been allowed visitation that she would have been able to demonstrate that she had rectified" the circumstances which led to her children's removal), rev'd and remanded per curiam, 362 N.C. 167, 655 S.E.2d 832 (2008) (adopting the reasoning of the Court of Appeals dissent). Thus, we find no prejudicial error and overrule this assignment of error.
Affirmed.
Judge HUNTER concurs.
Judge BEASLEY dissents in a separate opinion.
BEASLEY, Judge, dissenting.
With regard to the majority's holding that the trial court did not abuse its discretion by failing to appoint a guardian ad litem for Respondent, I respectfully dissent.
Our general statutes provide that a trial court may appoint a guardian ad litem for a parent in a termination of parental rights case, "if the court determines that there is a reasonable basis to believe that the parent is incompetent or has diminished capacity and cannot adequately act in his or her own interest." N.C. Gen.Stat. § 7B-1101.1(c) (2009). "A trial judge has a duty to properly inquire into the competency of a litigant in a civil trial or proceeding when circumstances are brought to the judge's attention, which raise a substantial question as to whether the litigant is non compos mentis." In re J.A.A. & S.A.A., 175 N.C.App. 66, 72, 623 S.E.2d 45, 49 (2005) (emphasis added) (citing Rutledge v. Rutledge, 10 N.C.App. 427, 432, 179 S.E.2d 163, 166 (1971)). Whether to conduct such an inquiry is in the sound discretion of the judge. Id. "However, `[a] court's complete failure to exercise discretion amounts to reversible error.'" In re M.H.B., 192 N.C.App. 258, 261, 664 S.E.2d 583, 585 (2008) (quoting State v. McVay, 174 N.C.App. 335, 340, 620 S.E.2d 883, 886 (2005)).
In this case, although Respondent was able to testify at the adjudication and disposition hearings, our review of the record makes it clear that her mental health was paramount to the allegations against her and her ability to comply with the trial court's orders. DSS initially investigated a report made by Respondent's father of Respondent's depression and threats against A.R.D. Respondent had *514 told A.R.D.'s grandfather that she had walked by A.R.D.'s bed and struck it because she hated A.R.D. and that she was going to throw A.R.D. in the trash. On 7 November 2006, the trial court entered an order adjudicating A.R.D. abused and neglected. The trial court found that A.R.D. "show[ed] no visible signs of neglect. She is clean, appropriately dressed and well-nourished. However, what concerns the [c]ourt is the mother's temper, her emotional imbalance and her extreme resistance to an authority figure such as DSS." In fact, the trial court found that when DSS returned with a deputy sheriff pursuant to a Non-Secure Custody Order, Respondent assaulted the deputy and then came toward him with a kitchen knife.
It is also noteworthy that the trial court qualified Respondent's ability to testify by finding that she "became extremely belligerent and emotional while testifying at this adjudication hearing" and found "[Respondent's] resentment and unwillingness to cooperate with DSS [to be] at a level rarely seen by this [c]ourt." The trial court ordered that A.R.D. remain in DSS custody and in the current placement with the maternal grandfather, and that Respondent be evaluated by a psychiatrist or psychologist and comply with treatment recommendations. On 16 January 2007, Respondent agreed, in a consent order, to comply with the terms of her case plan.
The only reference in the record to the evaluation results is in the petition to terminate parental rights, which mentions that Respondent submitted to the evaluation but did not follow the recommendations. There is no evidence in the record of the results of the psychological evaluation or a potential diagnosis for Respondent's behavior. Moreover, there is no indication that the trial court relied on any of the results from the psychological evaluation.
After a review hearing on 10 April 2007, the trial court ordered that A.R.D. be placed in Respondent's physical custody for a trial placement and that Respondent continue to comply with mental health services and parenting classes. In its order dated 1 May 2007, in finding of fact 7, the trial court found that the next day,
[o]n April 11 the mother called DSS to state that she could not take care of the Juvenile and that the problems between her and her father were so great that she could not take care of her daughter. DSS made the decision to place the Juvenile in foster care rather than return the Juvenile to the grandfather so as to improve the relationship between [Respondent] and her father. When [Respondent] learned that the Juvenile was going to foster care she lost control of her temper, screamed at the social worker, went to the car containing the Juvenile trying to open the door and even put her feet in front of the car tires to prevent the vehicle from moving. Eventually, law enforcement officers had to be called to subdue her in shackles. As a result of this episode [Respondent] was involuntarily committed to Broughton for one week. This episode convinces the [c]ourt that [Respondent] still retains deep emotional problems and instability. Her comments made about harming her daughter which led to the original removal from her home ... and this episode convinces the [c]ourt that [Respondent] remains a threat to harm herself, her child or someone else and that further counseling and treatment are needed.
This finding makes clear that the trial court was aware that Respondent had previously been involuntarily committed.
On 13 May 2008, DSS filed a petition to terminate Respondent's parental rights. In the petition, DSS recounted Respondent's history of emotional outbursts and erratic behavior, and alleged that although Respondent had completed court-ordered psychological evaluation, she had failed to complete recommended counseling. DSS alleged that "the combination of [Respondent's] depression, uncontrolled temper, and emotional imbalance has rendered [her] incapable of properly caring for her child and creates an atmosphere of potential danger for the Juvenile." Later review orders contain findings that Respondent remained emotionally and mentally unstable despite treatment. Subsequently, in both the adjudication and disposition orders, the trial court found that Respondent's "uncontrollable temper" and *515 "emotional imbalance" created a dangerous home environment for A.R.D.
Thus, it is apparent that Respondent's ongoing mental instability was a central cause contributing to the termination of her parental rights. In a review order entered on 14 October 2008, the trial court ordered DSS to cease reunification efforts. The trial court found that Respondent had completed anger management and parenting classes but DSS still considered her "emotionally unstable."
Recently, this Court addressed this issue in a case with similar determinative facts. See In re N.A.L. & A.E.L., Jr., 193 N.C.App. 114, 666 S.E.2d 768 (2008). In In re N.A.L., the juvenile was alleged to be dependent, and the termination of the mother's parental rights was due to the mother's "significant mental health issues which impact her ability to parent this child and meet his needs." Id. at 119, 666 S.E.2d at 771 (internal quotation marks omitted). Our Court concluded that the trial court should have inquired into the respondent-mother's competency and determined that she was in need of a guardian ad litem. Id. at 119, 666 S.E.2d at 771-72. This determination was based on the following facts: (1) the petition specifically alleged the respondent's incapability of providing proper care and supervision for her child; (2) the respondent had problems controlling anger outbursts and had a significant tendency to be aggressive towards others, including her child; and (3) a psychological assessment diagnosed the respondent as having a personality disorder and below average intellectual functioning. Id. at 119, 666 S.E.2d at 771.
In the case sub judice, on 26 June 2009, the trial court entered an adjudication order in which it concluded that grounds existed to terminate Respondent's parental rights based on neglect and the willful failure to make reasonable progress toward correcting the conditions that led to A.R.D.'s removal from the home. The trial court specifically found:
The combination of the mother's uncontrollable temper, emotional imbalance, dishonest behavior, uncooperative nature and actual specific acts of abuse and neglect as cited hereinabove have rendered the mother incapable of properly caring for her child, has created an atmosphere of potential danger for the Juvenile and establish by clear cogent and convincing evidence that her parental rights should be terminated[.]
As we have already discussed, the petition to terminate Respondent mother's parental rights in this case, as well as the adjudication and disposition orders, cited Respondent mother's continuing mental and emotional instability as a reason for terminating her parental rights. In most of its substantive orders throughout the pendency of this matter, the trial court made findings of fact regarding Respondent's lack of emotional stability and uncontrollable temper. Like In re N.A.L., the petition in this case specifically alleged that Respondent was incapable of properly caring for her child and created an atmosphere of potential danger due to her depression, uncontrollable temper, and emotional imbalance. Respondent exhibited problems controlling her angry and emotional outbursts on several occasions, including displays of aggression towards DSS and her child. While the results of Respondent's psychological evaluation are absent from the record, the trial court considered the opinion of Respondent's behavioral healthcare counselor that Respondent "suffers from depression and anxiety" in its order terminating her parental rights.
In another similarly situated case, In re M.H.B., the respondent claimed to suffer from posttraumatic stress disorder and to have been diagnosed as manic depressive and bipolar. In re M.H.B., 192 N.C.App. at 262, 664 S.E.2d at 586. The trial court's findings of fact included the following: "while [the respondent] was testifying in this case, the [c]ourt noted that he was weeping, crying, confounded, agitated"; the respondent was "mentally and emotionally unstable"; and the respondent had threatened to commit suicide. Id. at 262-63, 664 S.E.2d at 586. This Court stated that "these findings raise serious questions as to Respondent's competency, capacity, and ability to adequately act in his own interest." Id. at 264, 664 S.E.2d at 587. In concluding that the trial court *516 abused its discretion in failing to hold a hearing as to these questions, we reasoned:
We first recognize that although the trial court made numerous findings of fact that raised doubts as to Respondent's competency, capacity, and ability to adequately act in his own interest, the trial court did not make any findings resolving those doubts in favor of a finding that Respondent was competent and had the capacity and ability to adequately act in his own interest. In fact, the trial court could not have done so because it did not hold a hearing regarding these issues.
Furthermore, in its adjudication order, the trial court ordered that "[Respondent]... shall submit to a psychological evaluation and results of the same shall be made available unto [DSS] and the Guardian ad litem for [M.H.B.]" The trial court also ordered that "the Balsam Center shall allow [DSS] and the Guardian ad litem and other parties hereto access to and copies of any and all mental health records of the Balsam Center concerning [Respondent.]" Moreover, in its disposition orders, the trial court "suspend[ed] visitation between [Respondent] and [M.H.B.] at this time pending receipt and review of the reports from the Balsam Center by [DSS]." The trial court gave DSS "the discretion ... to start visitation between [M.H.B.] and [Respondent]," but only after DSS received and reviewed psychological records concerning Respondent from the Balsam Center. These orders demonstrate that the trial court had concerns regarding Respondent's competency and capacity that were serious enough to cause the trial court to order Respondent to undergo a psychological evaluation. The trial court even suspended Respondent's visitation rights pending a psychological evaluation. However, despite these concerns, the record does not show that the trial court considered appointment of a guardian ad litem for Respondent during the adjudication hearing.
Id. at 265-66, 664 S.E.2d at 587-88. In consideration of all the trial court's concerns regarding the respondent's ability to act in his own interest, "as reflected in its findings of fact, and the trial court's subsequent order that Respondent undergo a psychological evaluation," we reversed the adjudication and disposition orders because the trial court abused its discretion. Id. at 266, 664 S.E.2d at 588.
The instant facts are particularly similar. Importantly, In re M.H.B. referenced a psychological evaluation, like the one ordered here, but the record's lack of any report or diagnosis resulting therefrom did not preclude this Court from considering conduct of the respondent which suggested mental illness or inability to act in his own interest. Also, where threats of suicide by the respondent in In re M.H.B. appear to have been a weighty factor in our decision, the trial court in this case likewise noted that the episode of 11 April 2007 convinced it that Respondent "remain[ed] a threat to harm herself." These and the remaining findings by the trial court make it apparent that Respondent's conduct demonstrated a possible inability to adequately act in her own interest and that the court's conclusion terminating her parental rights was substantially, if not wholly, related to Respondent's mental and emotional condition. Thus, there appears a reasonable basis to believe that Respondent may be incompetent"lack[ing] sufficient capacity to manage [her] own affairs or to make or communicate important decisions concerning [her] person [or] family ... due to mental illness"or may have diminished capacity lacking the ability to perform mentallysuch that the trial court had a duty to properly inquire into Respondent's competency. Id. at 262, 664 S.E.2d at 585.
Following our holdings in In re N.A.L. and In re M.H.B., I would reverse and remand for a hearing to determine whether Respondent was in need of a guardian ad litem. See In re N.A.L., 193 N.C.App. at 119, 666 S.E.2d at 772. While I would not hold that the trial court abused its discretion in failing to appoint Respondent a guardian ad litem, I would hold that the trial court did abuse its discretion by failing to conduct an inquiry into whether Respondent needed a guardian ad litem. Id.