An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-248

NORTH CAROLINA COURT OF APPEALS

Filed:  19 August 2014

IN THE MATTER OF:

| K.R.M., K.A.L.M., | Cumberland County |
|---|---|
| Minor Juveniles. | Nos. 10 JT 89-90 |

Appeal by Respondent-Mother from order entered 19 November 2013 by Judge Edward A. Pone in District Court, Cumberland County.  Heard in the Court of Appeals 22 July 2014.

> *Elizabeth Kennedy-Gurnee for Petitioner-Appellee Cumberland County Department of Social Services.*
>
> *Ryan McKaig for Respondent–Appellant Mother.*
>
> *Beth A. Hall for Guardian ad Litem.*

McGEE, Judge.

Respondent-Mother ("the Mother") appeals from the order terminating her parental rights as to K.R.M. and K.A.L.M. ("the children").  The Mother contends the trial court abused its discretion by failing to conduct a hearing to determine whether it was necessary to appoint a guardian ad litem for her, and by

concluding that termination of her parental rights was in the childrens' best interests. We affirm.

The Cumberland County Department of Social Services ("DSS") first became involved with the Mother's family in 1997, while the Mother's father was incarcerated and the Mother was living with her paternal grandmother. The Mother's father was awarded custody of the Mother in 2003 when she was fifteen years old, after his release from incarceration. The Mother alleged in March 2006 that she had been sexually abused by her father, but that case was closed without further action.

The children were born in 2006 and 2007. DSS again became involved with the Mother in December 2009, when the Mother had a physical fight with her father because she threatened to report to authorities that he was the childrens' father. DSS provided services for the Mother, including personal and family counseling, public housing assistance, substance abuse and mental health assessments, and assistance in obtaining her GED. DSS obtained non-secure custody of the children on 17 February 2010.

DSS filed a petition in February 2010, alleging the children to be neglected and dependent. At adjudication, the Mother stipulated that the children were neglected. The

adjudicatory order, entered 30 June 2010, identified the Mother's father as the childrens' putative father, and the trial court found that multiple relatives believed that the Mother and her father were involved in an incestuous relationship.

On 24 July 2012, DSS filed a petition to terminate the parental rights of the Mother and four putative fathers, including the Mother's father. As grounds for termination of the Mother's parental rights, DSS alleged: (1) neglect; (2) failure to make reasonable progress toward correcting the conditions that led to the childrens' removal from the home after willfully leaving the children in foster care for twelve months; (3) willful failure to pay a reasonable portion of the cost of the childrens' care for six months prior to the filing of the petition; and (4) willful abandonment.

The trial court entered an Order of Paternity on 22 May 2013, establishing the Mother's father as the natural father of the children. The termination of parental rights hearing was held on 22 July 2013. The Mother was present at the hearing and testified at both the adjudication and dispositional phases of the hearing. The trial court entered an order terminating the Mother's parental rights on 19 November 2013, as well as the parental rights of the childrens' father/grandfather. The trial

court concluded there was sufficient evidence to support all four grounds alleged in the petition to terminate the Mother's parental rights, and that it was in the childrens' best interests to terminate the Mother's parental rights. The Mother appeals.

I.

In her first argument on appeal, the Mother contends the trial court abused its discretion by failing to conduct a hearing to determine whether it was necessary to appoint a guardian ad litem for her. The Mother contends the trial court was required to do so because the allegations against her were related to mental health issues caused by the abuse inflicted upon her by her father. We disagree.

"On motion of any party or on the court's own motion, the court may appoint a guardian ad litem for a parent who is incompetent in accordance with G.S. 1A-1, Rule 17." N.C. Gen. Stat. § 7B-1101.1(c) (2013).[1] "A trial judge has a duty to properly inquire into the competency of a litigant in a civil trial or proceeding when circumstances are brought to the

---

[1] The North Carolina General Assembly repealed N.C. Gen. Stat. § 7B-907 and replaced it with N.C. Gen. Stat. § 7B-906.1 for juvenile actions filed or pending on or after 1 October 2013. *See* 2013 N.C. Sess. Laws 129, § 25, 41 (June 19, 2013). We review this case pursuant to the amended statute. 2013 N.C. Sess. Laws 129, sec. 32.

judge's attention, which raise a substantial question as to whether the litigant is *non compos mentis*." *In re J.A.A. & S.A.A.*, 175 N.C. App. 66, 72, 623 S.E.2d 45, 49 (2005). "Whether to conduct such an inquiry is in the sound discretion of the trial judge." *In re A.R.D.*, 204 N.C. App. 500, 504, 694 S.E.2d 508, 511 (citation omitted), *aff'd per curiam*, 364 N.C. 596, 704 S.E.2d 510 (2010).

An incompetent adult "lacks sufficient capacity to manage the adult's own affairs or to make or communicate important decisions concerning the adult's person, family, or property whether the lack of capacity is due to mental illness, mental retardation, epilepsy, cerebral palsy, autism, inebriety, senility, disease, injury, or similar cause or condition." N.C. Gen. Stat. § 35A-1101(7) (2013). The trial court is not required to appoint a guardian ad litem in every termination of parental rights case where a cognitive limitation is alleged. Rather, the trial court should appoint guardians in cases where parents "would be unable to aid in their defense at the termination of parental rights proceeding." *In re J.A.A.*, 175 N.C. App. at 71, 623 S.E.2d at 48 (citations omitted).

In the case before us, although there was ample evidence that the Mother suffered extraordinary and appalling abuse by

her father, there was no evidence that the abuse impacted her ability to manage her own affairs, communicate with counsel, or participate in the termination hearing. In fact, the Mother testified at both the adjudication and the dispositional phases of the hearing and was able to explain her circumstances and articulate her own interest in retaining her parental rights.

In addition, contrary to the Mother's argument, the trial court held a hearing on 21 November 2012 regarding the need for appointment of a guardian ad litem for the Mother. The trial court appointed a guardian ad litem for the Mother in an order entered on 10 December 2012. One month later, the Mother's guardian ad litem and counsel filed a report that stated: "[The Mother] is able to fully communicate with her counsel and she understands the nature of the proceedings thereby no[t] requiring a guardian ad litem." The trial court entered an order allowing the guardian ad litem to withdraw. Therefore, the trial court did not abuse its discretion because it did investigate whether the Mother needed a guardian ad litem, appointed a guardian ad litem, and allowed the guardian ad litem to withdraw, based on the recommendation of the guardian ad litem and the Mother's counsel.

II.

In her remaining argument, the Mother contends the trial court abused its discretion by determining that termination of her parental rights was in the childrens' best interests. The Mother does not challenge the trial court's findings of fact, but argues that the extraordinary circumstances of this case override the trial court's best interests determination. We cannot agree.

Once the trial court has determined that a ground for termination exists, it moves to the disposition stage, where it must determine whether termination is in the best interests of the juvenile. N.C. Gen. Stat. § 7B-1110(a) (2013). In determining the best interests of the juvenile, the trial court shall consider the following factors:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C. Gen. Stat. § 7B-1110(a). The trial court must make written findings addressing the relevant factors. *In re J.L.H.*, ___ N.C. App. ___, ___, 741 S.E.2d 333, 337-38 (2012). The trial court's decision at this stage is reviewed for an abuse of discretion. *In re Anderson*, 151 N.C. App. 94, 98, 564 S.E.2d 599, 602 (2002).

In the present case, the trial court made the following relevant findings in the disposition portion of the termination order:

> 3.   [K.R.M.] . . . is currently five (5) years old.  [K.A.L.M.] . . . is currently six (6) years old.  The likelihood of adoption is great due to their age and placement.  The juveniles are of tender years.  The juveniles currently reside together in a pre-adoptive foster home with Mr. and Mrs. [R].  [K.A.L.M.] has been in that placement since she was two years old. [K.R.M.] was most recently placed there in October, 2012.  Mr. and Mrs. [R] are ready, willing and able to adopt the juveniles should they become available for adoption.
>
> 4.   That the permanent plan for the juveniles at this point is adoption.  This plan has been previously approved by the Court.   That the entry of an order terminating the parental rights of the Respondent Mother and the Respondent Father would aid in the accomplishment of that plan and is necessary in order to complete that plan.
>
> 5.   That with regard to the bond between

the juveniles and the Respondents, the Court finds that [K.R.M.] is autistic. She does not have a significant bond with either the Respondent Mother or the Respondent Father. At both the time of the removal of the juveniles from the home as well as at the time of the cessation of visitation, [K.A.L.M.] was very bonded to the Respondent Mother. [K.A.L.M.] remains very much aware of who her mother is and has photographs of her mother in a scrapbook. . . . The Respondent Mother was very bonded to both of the juveniles at the time of the cessation of the visitation, and that bond remains for her today.

6. Both juveniles are very bonded with their proposed adoptive parents. The juveniles call Mr. and Mrs. [R][] "mommy" and "daddy" in their own respective ways.

7. The juveniles are currently placed together in a safe and nurturing environment. This is preferred as they are siblings. The home in which the juveniles are placed is a two-parent home. The potential adoptive parents have two biological sons of their own. [The juveniles] know them as their brothers. The family is functioning as a family unit.

. . . .

10. [K.R.M.] is autistic and has special needs. She has been in this current placement since she was two (2) years old. At the time that she was placed with Mr. and Mrs. [R], [K.R.M.] was non-verbal. Today, [K.R.M.] is limited verbally; however, she is continuing to make progress. Mr. and Mrs. [R] have been very attentive to [K.R.M.]'s needs. They have made their home child friendly and set up areas to specifically address the needs of this very

special little girl, to include [K.R.M.] having her very own independent work area. . . . . The [R]s have worked diligently with [K.R.M.] to teach her sign language. Additionally, the [R]s and their two sons have also learned sign language in order that they may be able to effectively communicate with [K.R.M.]. Since [K.A.L.M.] has been placed in their home, [K.A.L.M.] has also been learning sign language.

11. [K.A.L.M.] has only been in the home since October, 2012; however, she has transitioned well into the home and fits right in. She enjoys being back together with her biological sister. [K.A.L.M.] is very talkative. She loves to go shopping, and she often spends time with Mr. [R]. Mr. [R] is a member of the United States Army. He has been deployed frequently; however, he most recently returned from deployment. [K.A.L.M.] enjoys spending time with Mr. [R]. He recently bought [K.A.L.M.] her own fishing pole and tackle box so they can go fishing.

. . . .

16. The Respondent Mother continued to be involved in acts of domestic violence with the Respondent Father. That has not changed.

17. The Respondent Mother has mental, emotional, and behavioral issues that are of a long standing and enduring nature. This Court is mindful that these issues the Respondent Mother has were created due to no fault of her own. The Respondent Mother was in fact a victim of sexual abuse and the Court is very mindful of that as well. However, the standard of this case at this juncture is what is in the best interest of the juveniles.

. . . .

21.  The Court finds that it is in the best interest of these juveniles for the purpose of obtaining safety, permanence, and stability that the parental rights of the Respondents . . . be terminated.

These findings demonstrate that the trial court considered all of the relevant statutory factors, and weighed them in arriving at the reasoned conclusion that termination of the Mother's parental rights was in the childrens' best interests.  In fact, the trial court's findings plainly establish that it gave careful consideration to the Mother's status as a victim of her own father's abuse.  Accordingly, we affirm the order terminating the Mother's parental rights.

Affirmed.

Judges STEELMAN and ERVIN concur.

Report per Rule 30(e).